# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE XURA, INC. | : | **CONSOLIDATED** |
| STOCKHOLDER LITIGATION | : | **C.A. No. 12698-VCS** |
| | : | |

## MEMORANDUM OPINION

Date Submitted:  September 11, 2018
Date Decided:  December 10, 2018

A. Thompson Bayliss, Esquire and David A. Seal, Esquire of Abrams & Bayliss LLP, Wilmington, Delaware, Attorneys for Plaintiff Obsidian Management LLC.

Robert S. Saunders, Esquire, Arthur R. Bookout, Esquire, Matthew P. Majarian, Esquire and Haley S. Stern, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, Attorneys for Defendants Frank Baker, Michael Hulslander and Siris Capital Group, LLC.

John L. Reed, Esquire, Ethan H. Townsend, Esquire, Peter H. Kyle, Esquire and Harrison S. Carpenter, Esquire of DLA Piper LLP (US), Wilmington, Delaware and Rudolf Koch, Esquire, Susan M. Hannigan, Esquire and Anthony M. Calvano, Esquire of Richards, Layton & Finger, Wilmington, Delaware, Attorneys for Defendant Philippe Tartavull.

**SLIGHTS, Vice Chancellor**

What began as an appraisal case has become, with the benefit of appraisal discovery, a breach of fiduciary duty case. The plaintiff here, Obsidian Management LLC, is a former stockholder of Xura, Inc. When an affiliate of Siris Capital Group, LLC acquired Xura via merger, Obsidian dissented and sought appraisal. According to Obsidian, in the discovery that followed the filing of its petition for appraisal in this Court, Obsidian uncovered evidence that Xura's former CEO, Philippe Tartavull, breached his fiduciary duties to Xura stockholders in the sale process leading up to the merger. It initiated this breach of fiduciary duty and aiding and abetting action individually, on its own behalf, against Tartavull and Siris, respectively, soon after.

The appraisal and fiduciary duty actions have been consolidated and the appraisal action stayed pending final adjudication of the breach of fiduciary duty and aiding and abetting claims. Defendants, Tartavull and Siris, have moved to dismiss those claims with prejudice under Court of Chancery Rule 12(b)(6). While Defendants base their principal merits defense on the so-called *Corwin* doctrine,[1] they also challenge Plaintiff's standing to bring this fiduciary duty action given that Plaintiff purportedly seeks identical relief in its pending appraisal action. If the

---

[1] *See Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015) (holding that "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies.").

1

Court determines that Plaintiff has standing, and that *Corwin* does not apply at the pleading stage, then Defendants challenge whether Plaintiff has stated viable claims—Tartavull challenges the sufficiency of Plaintiff's *Revlon*, care and loyalty claims and Siris challenges the sufficiency of the pled aiding and abetting claim.

In this Memorandum Opinion, I conclude (1) Plaintiff has standing to pursue these claims notwithstanding its pending appraisal action; (2) Plaintiff has pled facts that support a reasonable inference that the stockholder vote approving the merger was uninformed; (3) Plaintiff has pled a viable breach of fiduciary duty claim against Tartavull as Xura's CEO; and (4) Plaintiff has failed to plead a viable aiding and abetting claim against Siris.  My reasons follow.

## I.  FACTUAL BACKGROUND

I draw the facts from the allegations in the Complaint,[2] documents incorporated by reference or integral to the Complaint and judicially noticeable facts available in public Securities and Exchange Commission filings.[3]  For the purposes

---

[2] I cite to the Plaintiff's Verified Complaint for Breach of Fiduciary Duty as "Compl. ¶ __"; Philippe Tartavull's Opening Brief in Support of his Motion to Dismiss Plaintiff's Verified Complaint for Breach of Fiduciary Duty as "TOB"; Philippe Tartavull's Reply Brief in Further Support of his Motion to Dismiss Plaintiff's Verified Complaint for Breach of Fiduciary Duty as "TRB"; the Siris Defendants' Opening Brief in Support of Their Motion to Dismiss Plaintiff's Verified Complaint for Breach of Fiduciary Duty as "SOB"; the Siris Defendants' Reply Brief in Further Support of Their Motion to Dismiss Plaintiff's Verified Complaint for Breach of Fiduciary Duty as "SRB"; and Plaintiff's Combined Opposition to Defendants' Motions to Dismiss as "PAB."

[3] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (holding that, on a motion to dismiss, the Court may consider documents that are "incorporated by

of this Motion to Dismiss, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiff's favor.[4]

## A. Parties and Relevant Non-Parties

Plaintiff, Obsidian Management LLC, is a Delaware Limited Liability Company and former Xura, Inc. stockholder at all times relevant to this litigation.[5] Obsidian owned 933,555 shares of Xura common stock prior to the Merger.[6] As noted, Obsidian is also currently pursuing an appraisal of its Xura shares in this Court (the "Appraisal Action").[7]

Defendant, Philippe Tartavull, was Xura's CEO from 2012 until December 19, 2016.[8] He served as a director of Xura from 2012 until August 19, 2016—when an affiliate of Defendant, Siris Capital Group, LLC, acquired all

---

reference" or "integral" to the complaint); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006) (holding that trial courts may take judicial notice of facts in SEC filings that are "*not* subject to reasonable dispute") (emphasis in original).

[4] *Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 168.

[5] Compl. ¶ 20.

[6] *Id.*

[7] *Id.* ¶ 2. *See Obsidian Mgmt. LLC v. Xura, Inc.*, C.A. No. 12698-VCS (Del. Ch.).

[8] Compl. ¶ 21.

outstanding shares of Xura by merger (the "Transaction").[9] Xura terminated

Tartavull as CEO on December 19, 2016, four months after the Transaction closed.[10]

Defendant, Siris, is a Delaware Limited Liability Company. Defendant, Frank

Baker, is Siris's co-founder and one of its Managing Partners.[11] Defendant, Michael

Hulslander, is a principal of Siris, having been promoted after the Transaction's

closing.[12] For the sake of clarity, I refer to claims against these defendants

collectively as claims against the "Siris Defendants."

Non-party, Xura, Inc. (or "the Company"),[13] was a publicly traded Delaware

Corporation. Non-party, Jacky Wu ("Wu"), was Xura's CFO from April 2015 until

August 26, 2016.[14] Non-party, Hank Nothhaft, was Xura's Chairman of the Board

from October 2012 until August 19, 2016.[15] Non-party, Matthew Drapkin, was a

director of Xura from March 2014 until August 19, 2016.[16] Drapkin was a partner

---

[9] *Id.*

[10] *Id.* ¶ 107.

[11] *Id.* ¶ 22.

[12] *Id.* ¶ 23.

[13] For the sake of clarity, I use "Xura" to refer to Xura, Inc. regardless of the date. In doing so, I acknowledge that, prior to August 2015, Xura, Inc. was known as Comverse, Inc.

[14] *Id.* ¶ 25.

[15] *Id.* ¶ 26.

[16] *Id.* ¶ 27.

of Northern Right Capital Management, L.P., an activist investor that held a significant amount of Xura stock and routinely sought board seats on small-cap, public companies.[17]  Non-party, Goldman Sachs & Co. ("Goldman"), was Xura's longtime financial advisor and served in that capacity in connection with the Transaction.[18]

**B. Tartavull's First Contacts with Siris**

Tartavull first met Baker in Barcelona in 2012.  Tartavull sought out Siris as a potential financial sponsor for an acquisition involving the Company the following year.  In the discussions that ensued, the parties contemplated that Tartavull would remain as the CEO of the post-acquisition Xura and would serve as chair of an operating committee that would also include Siris executive partners and members of Xura's senior management.  While nothing came of these discussions in 2013, the two kept in touch.

In late 2014, Siris and Tartavull met again to discuss a potential acquisition of Xura.  Tartavull had lunch with Hubert de Pesquidoux, a Siris Executive Partner, and Baker on November 17, 2014.  Three days later, Tartavull joined Siris representatives for dinner where discussions about a possible acquisition continued.

---

[17] *Id.*

[18] *Id.* ¶ 4.

Later that month, Siris representatives attended a meeting at Xura's Wakefield, Massachusetts headquarters.

On January 7, 2015, Siris submitted a letter of interest in which it proposed to acquire Xura for $24 per share.[19] The letter underscored that Siris "continue[d] to be impressed by the senior leadership team and is excited about the prospect of partnering with them."[20] Xura's board of directors (the "Board") discussed Siris's expression of interest at its January 13, 2015 meeting. Before the Board could formally respond, however, Siris decreased its offer to $20–$22 per share citing significant execution risks and deteriorating financials. The Board rejected the offer and, again, the negotiations ended.

### C. Xura Focuses Inward

Following this second failed negotiation, Xura looked inward and endeavored to enhance shareholder value. On April 14, 2015, Xura entered into a Master Service Agreement with Tech Mahindra and began to outsource a significant portion of its workforce in exchange for payments totaling $211 million over six years. Two weeks later, on April 29, 2015, Xura sold its billing systems and support business (at the time this made up approximately half of Xura's revenues) to Amdocs for

---

[19] *Id.* ¶ 35; Definitive Proxy Statement on Schedule 14A (the "Proxy") at 27.

[20] Compl. ¶ 35.

$272 million. Then, on August 6, 2015, Xura acquired Acision Global Limited for $136 million in cash and 3.14 million shares of common stock. The transformation ultimately led the Company to its new name—Xura.

### D. Siris Circles Back

On October 19, 2015, Siris contacted Tartavull directly with an offer to acquire the new and improved Xura for $30–$32.50 per share. Once again, Siris made clear that it was "excited about the prospect of working with the management team to help Xura reach its full potential."[21] Tartavull and Baker immediately began discussing Siris's offer amongst themselves.[22] On October 21, 2015, Baker texted Tartavull looking for the Board's feedback on Siris's offer. According to the Proxy, Tartavull advised the Board of Baker's outreach at the time or soon after it occurred.[23]

The Board considered Siris's offer at its October 22, 2015 meeting and directed management to communicate to Siris that the offer was inadequate and the Company was not for sale. Tartavull provided this feedback to Baker in a telephone conversation on October 29, 2015.

---

[21] Compl. ¶ 39.

[22] As discussed below, Plaintiff contends that many of these discussions took place via text messages that Tartavull and Baker both failed to preserve notwithstanding a duty to do so. PAB 10.

[23] Proxy 28.

Siris was undeterred. On the day it received news of the Board's rejection from Tartavull, Siris representatives, Tartavull and Wu continued to discuss a possible acquisition, including a discussion of Xura's forecasts and other non-public information. Siris raised its offer to $35 per share the next day. In its offer letter, Siris stated that it was "excited about the opportunity of working with the Company and its leadership team to accelerate Xura's transformation without the scrutiny and pressures of the public markets."[24] Siris followed its letter with a request directed to Tartavull for an exclusivity period of four to six weeks. Tartavull promptly relayed the request to the Board.

### E. Siris Negotiates Directly with Tartavull and Management

The Board discussed Siris's revised proposal at its November 5, 2015 meeting. This time the Board "authorized management to continue discussing a potential transaction with Siris" and "authoriz[ed] the engagement of Goldman to assist the Company in the process."[25] The Board also authorized Xura's management to agree to a three-week period of exclusivity with Siris if Siris could confirm a deal price and provide assurances regarding financing.[26]

---

[24] Compl. ¶ 43.

[25] Compl. ¶ 44; Joskowicz Aff. Ex. I (Pl.'s Pre-Trial Br. 10; JX163); Proxy 29.

[26] Bookout Aff. Ex. 22 at XURA0000226.

8

On November 12, 2015, Goldman emailed Siris a contract extending the terms of the non-disclosure agreement Siris and Xura previously executed back in 2013.[27] That agreement stated:

> You agree that all (i) communications regarding the Transaction, (ii) requests for additional information, (iii) requests for facility tours or management meetings, and (iv) discussions or questions regarding procedures, *will be submitted or directed only to the Chief Executive Officer of the Company* or any designee thereof (the "Designated Officer"). You further agree that, subject to paragraph 11, under no circumstances will you or your Representatives discuss or otherwise communicate any aspect of the Transaction to any member of the management of the Company without the express written permission of the Designated Officer.[28]

Goldman and Xura management participated in discussions and due diligence sessions with Siris throughout November 2015.

In response to various data requests from Siris directed to Wu, on November 19, 2015, Goldman asked Hulslander to ensure that Siris copied Goldman on all transaction-related communications with Xura moving forward. On November 29, 2015, Hulslander forwarded Baker an email from Goldman offering to coordinate a call with Wu. Although Hulslander indicated he would participate in the call orchestrated by Goldman, internally he was working with his Siris team

---

[27] Bookout Aff. Ex. 8 at GS-XURA-000180426.

[28] Bookout Aff. Ex. 8 at GS-XURA-000180433–34. (Emphasis supplied).

9

to come up with a plan to exclude Goldman and work directly with Xura management to "get the remaining high priority data."[29]

Siris reiterated its $35 per share offer in a December 2, 2015 letter. Consistent with its previous communication, Siris again emphasized that it was "excited about the opportunity of working with the Company and its leadership team to accelerate Xura's transformation without the scrutiny and pressures of the public markets."[30]

The Board held a meeting on December 3, 2015, with Goldman and its legal advisor, DLA Piper LLP (US), to discuss Siris's December 2 letter. At the meeting, the Board created a committee consisting of Tartavull, Nothhaft and Drapkin (the "Strategic Committee"). According to the Proxy, the mandate of the Strategic Committee was to "review, evaluate and negotiate the terms of a potential transaction with Siris and to make certain decisions between meetings of the board of directors."[31] Despite its mandate, the Strategic Committee never met with Siris, never took any formal action and never kept minutes nor any written record of its activities. Instead, the Strategic Committee functioned essentially as a weekly check-in with Tartavull. Indeed, one of the three Special Committee members, Nothhaft, did not even realize that the Special Committee existed or that he was a

---

[29] Compl. ¶ 45.

[30] Compl. ¶ 46.

[31] Compl. ¶ 101.

10

member of the committee until he learned about it at his deposition in the appraisal litigation.

Later in December, Xura missed the filing deadline for its 10-Q when it encountered technical difficulties incorporating Acision's UK-based accounting system with Xura's system. Xura eventually filed its 10-Q on December 28, 2015.

Throughout January 2016, Xura's senior management and Goldman engaged in various meetings and due diligence sessions with Siris. Siris received access to the Company's data room on January 15, 2016. Management presentations highlighting Xura's revenue, bookings, expenses and product pipeline occurred during due diligence meetings on January 12 and 20–22, 2016.

All the while, Tartavull communicated directly with Siris on a regular basis without keeping Goldman informed—despite Goldman's stated preference that "communications go through [Goldman]."[32] Tartavull's regular communications with Siris troubled Wu, the Company's CFO. Accordingly, Wu asked Goldman to speak with Tartavull about channeling communications through Goldman. Goldman agreed, but Tartavull ignored the admonition. Siris likewise ignored Goldman's request that it be included in all communications with Xura. Indeed, at

---

[32] Compl. ¶ 53. Here again, Plaintiff alleges that these communications frequently occurred through text messages that have since been lost or destroyed. PAB 12.

his deposition, Hulslander acknowledged that, even though Goldman "smacked us on the hand," the direct communications with Tartavull continued.[33]

## F. Goldman Shops Xura Unsuccessfully

During the last week of January 2016, Goldman worked with the Board and senior management to identify nine potential parties that might have an interest in acquiring the Xura.[34] The interested parties included five financial sponsors and four strategic buyers.[35] After initial contacts, three financial sponsors (Bain Capital, Carlyle, and Thoma Bravo) and one strategic buyer (Nokia) executed confidentiality agreements and moved to the next stage of the sale process.[36]

The second stage of the process proved to be an effective filter.[37] Bain Capital never attended any presentations and never responded to Goldman's efforts to schedule a call.[38] Xura made management and financial presentations to Nokia,

---

[33] Compl. ¶ 53.

[34] Compl. ¶ 54; Proxy 30.

[35] Proxy 30.

[36] Compl. ¶ 54; Proxy 30.

[37] Compl. ¶ 57; Proxy 30.

[38] *Id.*

Thoma Bravo and Carlyle.[39]  Soon after, Nokia and Thoma Bravo informed Goldman they were no longer interested.[40]

The last potential bidder standing—Carlyle—soon followed the other suitors out of the process.  On March 8, 2016, Goldman had a call with Carlyle to discuss the Company's long-term model and to answer diligence questions.[41]  In doing so, Goldman did not hide the fact that Xura was a "complicated story."[42]  Prior to obtaining full diligence, on March 13, 2016, Carlyle provided Goldman with a verbal indication of interest in the range of $26–$27 per share.[43]  Nevertheless, Carlyle stated that it "[had] a lot of work to do to confirm."[44]  Goldman informed Carlyle that the offering price would at least have to match Siris's offer of $28 per share.[45]  Carlyle maintained it could not bid at that price and exited the bidding process thereafter.[46]

---

[39] *Id.*

[40] *Id.*

[41] Compl. ¶ 67.

[42] *Id.*

[43] Compl. ¶ 68; Proxy 31.

[44] *Id.*

[45] Proxy 31.

[46] Compl. ¶ 70; Proxy 32.

While Goldman was courting other bidders, Siris held firm and showed no sign of concern. From Hulslander's vantage point, "the Company [was] not 'for sale' and [Siris] ha[d] a proprietary angle on the deal . . . ."[47]

**G. Tartavull Lends Siris A Helping Hand**

Despite Xura's business transformation, its fortunes did not noticeably improve. On December 15, 2015, Xura announced disappointing preliminary third quarter results and disclosed the delay in filing of its Form 10-Q for the quarter ending October 31, 2015.[48] The Company's stock closed at $22.53 per share that day.[49] The trend of declining share value continued into 2016. On February 17, 2016, Xura's stock closed at $19.12 per share, marking a nearly 15% drop in the span of two months.[50] By February 24, 2016, the Company's common stock was trading at $18.64 per share.[51] At the time of the Transaction, Xura's stock was trading at $18.94 per share.[52]

---

[47] Compl. ¶ 55; Pl.'s Ex. 3.

[48] Compl. ¶ 49; Proxy 30.

[49] Proxy 30.

[50] *Id.*

[51] *Id.* 31.

[52] *Id.* 33.

During the course of due diligence, Siris grew uneasy about Xura's outlook, particularly its cash flow projections and the historic and pending liabilities.[53] Siris informed Goldman on February 18, 2016, that it intended to submit a revised indication of interest that incorporated these concerns.[54]

Meanwhile, an industry trade show, Mobile World Congress, convened from February 22 through 25, 2016 in Barcelona, the site of the original Tartavull-Siris encounter.[55] Baker planned to attend and to meet with "Xura personnel" while there.[56] Hulslander was on board, saying it made "sense to get together with [Tartavull] and part of his team in some capacity."[57] By the first day of the trade show, Baker and Tartavull had scheduled a lunch meeting.[58]

During that February 24 lunch, Baker and Tartavull discussed Siris's latest offer, the timing of the Transaction and possible additional M&A transactions.[59]

---

[53] Proxy 30–31.

[54] Compl. ¶ 59; Proxy 30.

[55] Compl. ¶ 60.

[56] Compl. ¶ 60.

[57] *Id.*

[58] *Id.*

[59] Compl. ¶ 61; Pl.'s Ex. 4.

15

Baker indicated Siris would offer $27 per share.[60] With a gentle nudge, Tartavull told Baker that the offer price should be $28 per share.[61] Baker later acknowledged that the parties "agreed" upon $28 in advance of Siris sending a letter to Tartavull memorializing that price.[62]

Tartavull did not inform anyone at Xura or Goldman about his meeting with Baker, either before or after it occurred.[63] Neither Baker nor Tartavull recalled this meeting at their depositions.[64] Moreover, none of this appeared in the Proxy or any other public filing.[65] The only evidence of the meeting is an internal communication between two lower-level Siris employees.[66]

The next day, Siris submitted a revised offer of $28 per share.[67] The letter echoed Siris's statement that it was "excited about the opportunity of working with the Company and its leadership team to accelerate Xura's transformation without

---

[60] Compl. ¶ 61.

[61] *Id.*

[62] *Id.* ¶ 62.

[63] *Id.* ¶ 63.

[64] *Id.* ¶ 61. ("At their depositions, Baker and Tartavull denied ever negotiating over price.").

[65] *Id.* ¶ 60.

[66] Compl. ¶ 61.

[67] *Id.* ¶ 64.

16

the scrutiny and pressures of the public markets."[68]  Siris also renewed its request for exclusivity.[69]

### H. Exclusivity and Tartavull's Continued Negotiations with Siris

On February 29, 2016, the Board, along with its legal and financial advisors, met to discuss Siris's revised proposal—oblivious to Tartavull's side conversations with Siris.[70]  The Board discussed the terms of Siris's proposal, the downward adjustment of Xura's financial projections and forecasts, the underperformance of the Acision business and the Company's ability to execute its strategic plan.[71]  The Board then "authorized management to continue discussing a potential transaction with Siris."[72]  The Board also authorized management to negotiate the length of a "go-shop" period and the amount of the termination fee in exchange for a grant of exclusivity.[73]  Tartavull participated in a due diligence call on March 5, 2016, and

---

[68] *Id.*

[69] Proxy 31.

[70] Compl. ¶ 64; Proxy 31.

[71] Proxy 31.

[72] JX 258.

[73] Proxy 31.

Xura representatives attended meetings with Siris and their respective advisors from March 7 through March 11, 2016.[74]

Siris reiterated its revised indication of interest at $28 per share and again requested exclusivity on March 14, 2016.[75] On the following day, the Board authorized management to enter into an exclusivity agreement until April 8, 2016.[76]

In the meantime, Wu continued to express concern to Goldman regarding Tartavull's contacts with Siris. Indeed, he stated internally that Tartavull "appears to be working directly with Siris on his own."[77] On March 17, 2016, one day after he executed Siris's exclusivity agreement, Tartavull told Siris privately that Wu told "white lies."[78] He even suggested that Siris assign someone to take over Wu's modeling functions during the transaction process.[79] This prompted Baker to instruct his team to "triple check" Xura's numbers and to plan a "mind meld" between Wu and a possible replacement.[80]

---

[74] Compl. ¶¶ 65–66; Proxy 31.

[75] Proxy 32.

[76] *Id.*

[77] Compl. ¶ 72.

[78] Compl. ¶ 73; Pl.'s Ex. 5.

[79] Compl. ¶ 73.

[80] *Id.*

18

## I. Siris Retrades Again

On March 23, 2016, Michael Ronen from Goldman predicted Siris's next move: "[h]ere comes the price renegotiation . . . [w]e are in exclusivity and now [S]iris will create a crisis to take price down[.]"[81]  Wu saw the price reduction coming too, noting that Siris was going to "try to retrade."[82]

The day after Goldman predicted Siris's retrade, Siris retraded.  Siris advised Goldman it might not be able to offer more than $24 per share.  Siris confirmed its position with Tartavull on April 6, 2016, stating it could no longer support its prior offer of $28 per share.

That same day, the Board met to discuss the status of the sale process.  At the meeting, management advised the Board that it might not be able to file Xura's Form 10-K for fiscal year ended January 31, 2016 on time.  The Board instructed Goldman to disclose the potential delay to Siris.  Goldman did so and then, to make matters worse, Goldman had to provide Siris with downward revisions to the Company's financial projections.

On April 7, 2016, Goldman and the Board decided that the right response to Siris's retrade strategy was to go "radio silent."[83]  Tartavull, however, apparently

---

[81] Compl. ¶ 76; Pl.'s Ex. 6.

[82] Compl. ¶ 74.

[83] Compl. ¶ 79; Pl.'s Ex. 8.

thought otherwise. He contacted Baker directly to discuss next steps. When Siris contacted Wu to follow up, Wu lamented to Goldman, "[w]e are bidding against ourselves."[84]

On April 9, 2016, Siris offered $24.75 per share after speaking with Tartavull. Siris justified this price move by emphasizing the material decline in projected cash flow and the overall underperformance of the Company's businesses. The Board discussed the revised offer at its April 12, 2016 meeting and instructed Goldman that Siris must raise its price to $25 per share to extend exclusivity. Siris agreed to the $25 price, and Xura extended the exclusivity period for two weeks.

## J. An Interested Seller Is Diverted to Buy Side

On April 15, 2016, Xura publicly announced that it would not meet its 10-K filing deadline again and that it was in negotiations with a potential buyer for a sale at $25 per share. In that announcement, Xura stated that it missed the 10-K filing deadline due to "complex strategic negotiations for the potential sale of the company."[85] Immediately following the announcement, Keith Geeslin of Francisco Partners contacted Tartavull to let him know that "if Xura is going to be sold, [Francisco Partners] would appreciate the opportunity to bid."[86] For reasons not

---

[84] *Id.*

[85] Compl. ¶ 88.

[86] *Id.* ¶ 89; Pl.'s Ex. 9.

20

coincidental by Plaintiff's lights, Francisco Partners never made a bid because, somehow, it learned Siris was the potential buyer.[87]  Instead, Francisco Partners contacted Siris about a potential co-investment on the buy-side of the transaction.

**K. The Merger Agreement, the Unfruitful Go-Shop and Stockholder Litigation**

On May 19, 2016, Xura's Board held a special meeting to discuss the terms of the proposed transaction with Siris.  During the meeting, the Board deliberated Siris's request that Xura do without a go-shop or at least limit it to 30 days. The Board declined and insisted on a 45-day go-shop.  Goldman also presented its preliminary financial analysis of the proposed transaction.  The Board met again on May 22, 2016.  DLA Piper LLP (US) discussed the material terms of the proposed Transaction and Goldman presented an oral fairness opinion.

On May 23, 2016, Xura and Siris executed a definitive merger agreement at $25 per share (the "Merger Agreement").  The Merger Agreement provided for a 45-day go-shop (the "Go-Shop"), a 2% termination fee (or $0.50 per share) if a superior proposal was submitted during the Go-Shop and a 3.5% termination fee (or $0.875 per share) if a superior proposal was submitted after the Go-Shop.

On May 25, 2016, Siris executed an NDA with Neuberger Berman ("Neuberger"), which at the time held over 5% of Xura's stock.  By the end of June

---

[87] Compl. ¶ 90.

2016, Neuberger had sold nearly all of its Xura stock. Instead of exiting its investment in Xura, however, Neuberger was co-investing its equity with Siris. Neuberger-controlled entities ultimately co-invested $16,985,345 on the buy-side of the Transaction. Thus, by the time of closing, both Neuberger and Francisco Partners had joined Siris on the buy-side.

During the Go-Shop, Goldman contacted 26 prospective buyers, including Francisco Partners and all of the other parties contacted during the pre-signing market check. While three parties entered into confidentiality agreements during the Go-Shop, none submitted acquisition proposals. By June 15, 2016, Goldman reported that there were no parties participating in the Go-Shop. Regarding Francisco Partners, Tartavull said at his deposition: "since Siris was engaged, I don't think [Francisco Partners] want[ed] to go to battle seriously in a go-shop."[88] Indeed, Plaintiff alleges that Tartavull approved Francisco Partners as a financing source for Siris before the Go-Shop period expired.[89]

On July 11, 2016 and July 22, 2016, Xura stockholders filed lawsuits in the United States District Court for the District of Massachusetts seeking to enjoin the Merger (the "Massachusetts Actions"). On July 26, 2016, Xura, Siris and the

---

[88] Compl. ¶ 96.

[89] *Id.*

22

Massachusetts plaintiffs reached an agreement whereby Xura would issue a supplemental proxy statement in exchange for a release of all claims related to the Merger against Xura, its directors and Siris.

On August 16, 2016, a majority of Xura's stockholders voted to approve the Merger. The Transaction closed on August 19, 2016. After closing, Tartavull negotiated a long-term incentive plan that could have paid him over $25 million.[90] That plan yielded no benefits for Tartavull, however, because Xura terminated Tartavull after closing on December 19, 2016, before the plan could be executed.

## L. Tartavull Faces Job Uncertainty

As Tartavull negotiated the Xura/Siris combination, Xura stockholders and the Board contemplated Tartavull's future with the Company in the event a transaction was not consummated. Major stockholders, including Wellington Asset Management and Steinberg Asset Management, openly questioned Tartavull's performance. In early March, before Xura and Siris agreed to exclusivity, Obsidian indicated that it intended to launch a proxy contest and made clear to both Tartavull and the Board its view that Xura should find a new CEO. In April, Nothhaft

---

[90] Compl. ¶ 95 ("After the execution of the Merger Agreement, Tartavull and Siris began finalizing the terms of a long-term incentive plan for employees Siris intended to retain (the "LTIP"). Siris asked Tartavull to provide the list of participants for the LTIP prior to the close of the Merger. Tartavull and Siris ultimately agreed on LTIP allocations that promised a potential payout to Tartavull of over $25 million.").

privately advised Tartavull that the Board was considering major changes if there was no deal, including changes at the Board level and the highest ranks of management.[91] Thus, as Tartavull engaged in private negotiations with Siris, he was facing a genuine risk that he would lose his job at Xura if the Company was not acquired. And he knew it.

## M. Lost Cell Phones, Lost Data and Claims of Spoliation

Throughout the process that led to the Merger, Tartavull, Baker and Hulslander exchanged text messages on various personal and business devices. Many if not most of those messages have been either lost or destroyed.[92] As alleged,

---

[91] *Id.* ¶ 84. ("Xura's board had begun to consider making changes to the management team absent a sale, and certain directors had concluded that Tartavull should go. Nothhaft told this to Tartavull. . ."). Unlike the major stockholders' dissatisfaction and the proxy contest rumblings, however, Nothahft's confidential message to Tartavull regarding his dim future with the Company was not disclosed to shareholders or potential buyers, including Siris.

[92] *Id.* ¶ 109. Plaintiff asks the Court to draw an adverse inference at the pleading stage given its well-pled allegations of spoliation. Delaware courts have yet to decide whether an adverse inference is available to the plaintiff at the pleading stage when responding to a motion to dismiss. Some federal courts have held that an adverse inference may be drawn at the motion to dismiss stage; others have held that adverse inferences must be preceded by thorough factual inquiries and findings. *Compare Callahan v. Schultz*, 783 F.2d 1543, 1545 (11th Cir. 1986) (holding that "[u]nder the adverse inference rule, we hold the district court was justified in denying the government's motion to dismiss[]" where government failed to produce exhibits it claimed would justify dismissal); *Richtek Tech. Corp. v. uPI Semiconductor Corp.*, 2011 WL 1627986, at *1 (N.D. Cal. Apr. 28, 2011) (describing order requiring defendant to produce documents where "failure to comply fully may result in an adverse inference being drawn against Powerchip in its motion to dismiss (and possibly future motions).") *with ABC Bus. Forms, Inc. v. Pridamor, Inc.*, 2009 WL 4679477, at *3 (N.D. Ill. Dec. 1, 2009) (citation omitted) (striking spoliation allegations from pleadings because "'[s]poliation of evidence' . . . may be the basis for sanctions, but it does not 'give rise in civil cases to substantive claims or defenses.'"); *Jarvis v. FedEx Office & Print Servs., Inc.*, 2009 WL 3579035, at *3 (D. Md. Oct. 27, 2009) (holding that "[p]laintiff's

24

Tartavull was under a duty to preserve documents no later than May 30, 2016, when Xura received a litigation demand letter relating to the Merger.[93] The Siris Defendants were obliged to preserve documents, as alleged, no later than July 11, 2016, when the first of the Massachusetts complaints named them as parties.[94] It is alleged that those preservation obligations continued after Plaintiff filed the Appraisal Action and after Plaintiff served discovery seeking text messages.[95]

Tartavull used multiple phones during the Merger negotiations. He turned over one of his phones to Xura when he departed in December 2016.[96] Xura then restored the factory settings on the phone and thereby wiped its data. To date, the

---

request for sanctions based on spoliation of evidence is improper at this [pleading] stage of the proceedings."); *Forest Labs., Inc. v. Caraco Pharm. Labs., Ltd.*, 2009 WL 998402, at *1 (E.D. Mich. Apr. 14, 2009) ("[S]poliation is not a substantive claim or defense but a 'rule of evidence[.]'") (citation omitted); *Rodriguez v. Ocean Motion Watersports, Ltd.*, 2014 WL 11880984, at *2 (S.D. Fla. Nov. 5, 2014) (addressing motion to dismiss and holding that spoliation inference plaintiff sought "would be more appropriately prayed for in a later motion."). The issue is interesting, to be sure, but I need not address it here as I have determined, applying the generous inferences that flow to Plaintiff under Chancery Rule 12(b)(6), that the Complaint as to Tartavull survives dismissal without the need for adverse inferences and cannot survive dismissal as to Siris even with reasonable adverse inferences.

[93] Compl. ¶ 110.

[94] *Id.* ¶ 111.

[95] *See* Pl.'s Exs. 10–12.

[96] *Id.*

parties have had no success mining data from that phone.[97] In the Appraisal Action, Tartavull produced some text messages from a different unwiped phone, but that production did not include pre-Closing texts, some of which were mentioned in emails that were produced.[98]

Baker initially indicated that he damaged his Blackberry in March 2017, at least eight months after he incurred a duty to preserve.[99] He stated that he disposed of the Blackberry after it stopped working, though Siris stated in a verified interrogatory response that the device was lost.[100] In January 2018, after the Court heard argument on Obsidian's Motion for an Adverse Inference in the Appraisal Action, Baker found his Blackberry in a ski bag.[101] Because Baker cannot remember the password, however, no one has been able to recover any data from that device either.[102]

---

[97] *Id.*

[98] *Id.* ¶ 113.

[99] *Id.* ¶ 111.

[100] *Id.*

[101] Compl. ¶ 111. I note that the Court has not issued a final ruling on Obsidian's spoliation motion in the Appraisal Action but expects that the motion will be renewed and resolved in this litigation.

[102] *Id.*

Hulslander inadvertently "cleared" his phone in June 2017, at least eleven months after he incurred a duty to preserve.[103] More specifically, he incorrectly entered the password on his phone too many times thereby triggering a feature that automatically wiped the data from memory.[104]

### N. Procedural Posture

Plaintiff filed its Appraisal petition on August 29, 2016. On January 29, 2018, the Massachusetts plaintiffs abandoned the proposed settlement of the Massachusetts Actions and dismissed their complaints. Plaintiff filed this fiduciary duty action soon after, on March 30, 2018. On April 18, 2018, the Court continued the appraisal trial and informed the parties that it would consolidate the Appraisal Action and this action. Siris moved to dismiss this action on April 30, 2018. Tartavull filed his motion to dismiss on May 14, 2018.

## II. LEGAL ANALYSIS

Under Court of Chancery Rule 12(b)(6), a complaint must be dismissed if the plaintiff would be unable to recover under "any reasonably conceivable set of circumstances susceptible of proof" based on the facts pled in the complaint.[105] In

---

[103] *Id.* ¶ 112.

[104] *Id.*

[105] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 168 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

considering a motion to dismiss, the Court must accept as true all well-pled allegations in the complaint and draw all reasonable inferences from those facts in Plaintiff's favor.[106] The Court need not accept conclusory allegations that lack factual support, however, or "accept every strained interpretation of the allegations proposed by the plaintiff."[107] Because the Complaint incorporates several documents by reference, and makes clear that others are integral to the Complaint, the Court may consider those documents in their entirety for purposes of deciding the Motion.[108]

I address Plaintiff's claim against Tartavull first. In doing so, I consider the following issues: (1) does Plaintiff have standing to assert his breach of fiduciary duty claims; (2) if so, does *Corwin* cleansing apply; (3) if not, has Plaintiff stated a claim of breach of fiduciary duty against Tartavull as Xura CEO; and (4) if so, does Board approval of Tartavull's conduct cleanse any breach of fiduciary duty that

---

[106] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 168.

[107] *Id.*

[108] *See Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) (stating that the court may consider on motion to dismiss documents beyond the complaint if the documents are "integral to . . . and incorporated [within] the complaint.") (citation omitted); *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (stating that a "plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms.") (citations omitted); *In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *4 n.17 (Del. Ch. Sept. 27, 2013) ("A document is integral if it is the 'source' of the facts pled.") (citation omitted).

might be pled. With respect to Plaintiff's claim against Siris, I consider whether Plaintiff has well-pled all of the *prima facie* elements of aiding and abetting a breach of fiduciary duty, with a particular concentration on whether it has adequately pled that Siris knowingly participated in the alleged breach.

**A. Plaintiff Has Adequately Pled a Breach of Fiduciary Duty Against Tartavull as Xura CEO**

"A public policy, existing through the years . . . demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation . . . ."[109] In essence, Plaintiff alleges Xura was steered into the Transaction by a fiduciary who had an interest different from shareholders, namely self-preservation.[110] While Plaintiff does not concede that Tartavull stands alone in his breach of fiduciary and, indeed, maintains that Xura's Board (or at least its

---

[109] *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939). *See also id.* ("Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.").

[110] *See In re Zenith Nat'l Ins. Corp. S'holders Litig.*, C.A. No. 5296-VCL, at 5 (Del. Ch. Apr. 22, 2010) (TRANSCRIPT) (describing the risk that a "CEO might steer the deal or the process to a particular buyer or particular result with whom he either has a long-time relationship or some expectation [] of benefits"); *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 194 (Del. Ch. 2007) ("If management had an incentive to favor a particular bidder (or type of bidder), it could use the . . . process to its advantage, by using different body language and verbal emphasis with different bidders.").

Strategic Committee) bears some responsibility for the harm done here,[111] it has trained its sights on Tartavull as the most culpable and most accessible (i.e., non-exculpated) actor.[112]

For his part, Tartavull (joined by Siris) argues that, to justify dismissal, the Court need look no further than the fully informed, uncoerced and disinterested stockholder approval of the Transaction and the cleansing effect of that approval on any breach of fiduciary duty claim Plaintiff might otherwise be able to plead against him.[113] He also maintains that Plaintiff has not well-pled a breach of fiduciary duty

---

[111] *See In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 835 (Del. Ch. 2011) (holding that board acted unreasonably by allowing conflicted investment bank to negotiate price with bidder); *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 117 (Del. Ch. 2007) (criticizing special committee because it failed to chaperone conflicted CEO's negotiations with the buyer and failed to provide "more assurance that [the CEO] would take a tough line and avoid inappropriate discussions that would taint the process."); *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d at 194 (criticizing special committee because they "let this process be driven by management[]" despite the concern that "some bidders might desire to retain existing management or to provide them with future incentives while others might not.").

[112] *See Gantler v. Stephens*, 965 A.2d 695, 709 n.37 (Del. 2009) (holding that 8 *Del. C.* § 102(b)(7) does not authorize the exculpation of corporate officers).

[113] *Corwin*, 125 A.3d at 309 (holding that the business judgment rule is the standard of review when a transaction is approved by a majority of disinterested, uncoerced fully informed stockholders). In deciding this motion, I have presumed, as the parties do, that the business judgment rule applies to Tartavull as CEO. I acknowledge, however, that this point is not settled in our law and that there is a lively debate among members of the academy regarding whether corporate officers may avail themselves of business judgment rule protection. *See, e.g.*, Michael Follett, *Gantler v. Stephens: Big Epiphany or Big Failure? A Look at the Current State of Officers' Fiduciary Duties and Advice for Potential Protection*, 35 Del. J. Corp. L. 563, 576 (2010) (suggesting that officers are protected by the business judgment rule); Lyman P.Q. Johnson, *Corporate Officers and the Business Judgment Rule*, 60 Bus. Law. 439 (2005) (applying principles of agency and making the

claim even if *Corwin* cleansing is unavailable.  As a threshold matter, however, Tartavull argues that the Court lacks jurisdiction to consider the *bona fides* of Plaintiff's claims because Plaintiff lacks standing to bring them.  I take up that issue first.

### 1.  Plaintiff Has Standing

Tartavull cites then-Chancellor Strine's decision in *In re Appraisal of Aristotle Corp.* in support of his argument that Plaintiff lacks standing to pursue breach of fiduciary duty claims given that he has already filed, and has pending, a petition for appraisal relating to the Transaction.[114]  In *Aristotle*, the court rejected the plaintiffs' attempt to "complicate" a pending appraisal case by asserting a "late-breaking" breach of fiduciary duty claim that would "only yield [them] a right to a 'quasi' version of something they already possess in its actual form."[115]  That is not what is happening here.

First, unlike *Aristotle*, where the plaintiff's breach of fiduciary duty claim focused on alleged disclosure violations, Plaintiff has raised disclosure failures as

---

case that officer conduct should be evaluated under a negligence paradigm); Lawrence A. Hamermesh & A. Gilchrest Sparks III, *Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson*, 60 Bus. Law. 865 (2005) (arguing that Delaware courts should approach officer liability in much the same manner they approach director liability).

[114] *In re Appraisal of Aristotle Corp.*, 2012 WL 70654 (Del. Ch. Jan. 10, 2012).

[115] *In re Appraisal of Aristotle Corp.*, 2012 WL 70654, at *3.

much to plead around Tartavull's *Corwin* defense as to state affirmative claims for relief.[116] The gravamen of Plaintiff's breach of fiduciary duty claim is that a conflicted fiduciary directed Xura to consummate an undervalued transaction for reasons other than the best interests of stockholders. The disclosure allegations accent that claim but they are not proffered as the essence of the breach. Second, unlike *Aristotle*, where the plaintiff sought only quasi-appraisal as a remedy for the alleged fiduciary breach, Plaintiff has sought more traditional post-closing remedies as redress for Tartavull's alleged breach, including rescissory damages and disgorgement.[117] Under our law, Plaintiff has standing to maintain both this claim and its appraisal claim.[118]

---

[116] *See In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57830, at *7-8 (Del. Ch. Jan. 5, 2017) (holding that "a plaintiff challenging the decision to approve a transaction must first identify a deficiency in the operative disclosure document, at which point the burden would fall to defendants to establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote.").

[117] *See In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35 (Del. Ch. 2013) (describing difference between appraisal and fiduciary duty cases as "[t]he breach of fiduciary duty claim seeks an equitable remedy that requires a finding of wrongdoing. The appraisal proceeding seeks a statutory determination of fair value that does not require a finding of wrongdoing.").

[118] *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1187–88 (Del. Ch. 1988) (holding that shareholder had standing to pursue a breach of fiduciary duty claim seeking rescissory damages while also pursuing appraisal remedy).

## 2. *Corwin* Does Not Apply at the Pleading Stage

As noted, Tartavull (and Siris) argue that *Corwin* requires application of the business judgment standard and dismissal of the claim because an informed, uncoerced majority of Company's stockholders approved the Transaction.[119] I disagree. As pled, Xura's stockholders could not have cleansed conduct about which they did not know.

"[O]ne [disclosure] violation is sufficient to prevent application of *Corwin*."[120] Here, Plaintiff has adequately pled seven. From the public disclosures provided to Xura stockholders, it is reasonably conceivable that stockholders lacked the following material information when they voted to approve the Transaction: (1) Tartavull and Siris regularly communicated regarding the Transaction in private without the knowledge or approval of the Board or Goldman; (2) Tartavull and Baker negotiated price terms directly without Board approval, and Tartavull advised Siris what offer the Board would accept[121]; (3) Siris made clear its intention to work with management (including Tartavull) after consummation of the Transaction in all of

---

[119] TOB at 29. *See Singh v. Attenborough*, 137 A.3d 151 (Del. 2016) (ORDER) ("When the business judgment rule standard of review is invoked because of a vote, dismissal is typically the result").

[120] *van der Fluit v. Yates*, 2017 WL 5953514, at *8 n.115 (Del. Ch. Nov. 30, 2017).

[121] *Alessi v. Beracha*, 849 A.2d 939, 946 (Del. Ch. 2004) (holding that negotiations between buyers and target's CEO were material when the parties discussed "significant terms" including "valuation").

its offer letters to the Company; (4) the Strategic Committee did not do the work attributed to it in the Proxy; (5) Francisco Partners initially expressed interest in offering a superior bid but somehow learned that Siris was Xura's counterparty and then moved its financial support to the buy-side of the Transaction[122]; (6) Siris offered Neuberger a "side deal" by inviting it to co-invest its equity with Siris on the buy-side; and (7) Tartavull received word from Nothhaft during negotiations with Siris that his position at Xura was in jeopardy if the Company was not sold.[123]

In deciding that Plaintiff has pled facts supporting a reasonable inference that stockholder approval of the Transaction was uninformed, I am mindful that our law

---

[122] In this regard, I acknowledge Defendants' argument that Plaintiff merely speculates regarding whether Francisco Partners ultimately would have made a bid for Xura and whether that bid would have been superior to the Siris bid. Plaintiff's response—that we will never know where the Francisco Partners' overture might have gone—is, likewise, well taken. Indeed, as a wise "do-dah man" once observed, "Sometimes your cards ain't worth a dime if you don't lay 'em down." Garcia, Lesh, Weir, Hunter, *Truckin* (1970). In any event, what is conceivably material about Francisco Partners is not its initial expression of interest but the fact that it expressed interest, later declined to participate in the Go-Shop and then mysteriously joined forces with Siris on the buy-side of the Transaction.

[123] *See van der Fluit*, 2017 WL 5953514, at *8 (finding that dismissal under *Corwin* was inappropriate because the proxy failed to disclose that "Opower negotiators were Yates and Laskey, who each received post-transaction employment and the conversion of unvested Opower options into unvested Oracle options . . . ."); *cf. City of Miami Gen. Empls.' & Sanitation Empls.' Ret. Tr. v. Comstock*, 2016 WL 4464156, at *15 (Del. Ch. Aug. 24, 2016), *aff'd*, 158 A.3d 885 (Del. 2017) (holding that a board need not "disclos[e] details about offers [for acquisition] that directors conclude are not worth pursuing"—a fact directly opposite of the facts pled here where Plaintiff alleges that Xura did, in fact, pursue Francisco Partners in during the go-shop).

does not require boards to engage in self-flagellation in their public disclosures.[124]

Even so, to invoke *Corwin* cleansing at the pleading stage, a fiduciary defendant must demonstrate that stockholders possessed all material information before casting the votes that provide the basis for cleansing. Plaintiff alleges that stockholders were entirely ignorant of the extent to which Tartavull influenced the negotiations and ultimate terms of the Transaction, not to mention his possible self-interested motivation for pushing an allegedly undervalued Transaction on the Company and its stockholders. Having found that these allegations are well-pled, this is enough to justify denying Tartavull business judgment deference at the pleading stage by virtue of the stockholder vote.[125]

### 3. Plaintiff Has Pled a Viable Claim Against Tartavull

Tartavull was a CEO leading a sale process. Plaintiff has well-pled that his interests—e.g., a $25 million payout and continued employment post-closing in the face of his looming termination from stand-alone Xura[126]—were different than those

---

[124] *Stroud v. Grace*, 606 A.2d 75, 84 n.1 (Del. 1992) ("[A] board is not required to engage in 'self-flagellation' . . . .").

[125] *See Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *20 (Del. Ch. May 31, 2017) (observing that "*Corwin* 'was never intended to serve as a massive eraser, exonerating corporate fiduciaries for any and all of their action or inactions preceding their decision to undertake a transaction for which stockholder approval is obtained.'") (quoting *In re Massey Energy Co. Deriv. Litig.*, 2017 WL 1739201, at * 19 (Del. Ch. May 4, 2017)).

[126] Compl. ¶ 95.

of Xura's stockholders. Continued employment in itself is a material interest.[127] In *In re Answers Corp. Shareholders Litigation*, the court refused to dismiss a complaint alleging that a CEO's desire to keep his job caused him to seek a quick sale of the company.[128] Plaintiff has alleged that, as Tartavull was engaged in unauthorized discussions with Siris, he knew that both the Board and stockholder activists were displeased with his performance and likely would remove him from office if a sale of the Company did not occur. According to the well-pled allegations in the Complaint, this looming reality prompted Tartavull to favor Siris over other potential bidders, to feed information to Siris that would fortify its bid and then to negotiate quickly for his Transaction-related payout.[129] These allegations are adequate at this stage to state a claim for breach of fiduciary duty.

---

[127] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 978 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004) (finding that president, chief operating officer and director of corporation had "a material interest in her own continued employment.").

[128] *In re Answers Corp. S'holders Litig.*, 2012 WL 1253072, at *7 (Del. Ch. Apr. 11, 2012) (refusing to dismiss complaint alleging CEO's desire to keep his job caused him to seek a quick, undervalued sale of the company).

[129] Compl. ¶¶ 61, 63, 73, 79, 83, 84, 95, 107. It is remarkable to see evidence that a CEO undermined the authority and questioned the competency of his CFO in direct communications with a potential acquirer at the peak of negotiations during a sale process. Yet, that is what the pled evidence reveals here. It is not surprising, therefore, that the CFO (Wu) testified at deposition that he believed Tartavull's direct contacts with Siris "undermined the [C]ompany's negotiating position." Compl. ¶ 79.

### 4. Board Approval Does Not Cleanse Tartavull's Conduct

Tartavull argues that, because "no director besides Tartavull is named in the Complaint[,]" and because "Plaintiff does not dispute that a majority of the Board was independent and disinterested[,]" to state a claim against him, Plaintiff must adequately plead that "the Board did not act in good faith in approving the Transaction."[130] Here again, I disagree. A plaintiff need not allege that a majority of the board committed a non-exculpated breach by failing to supervise management in order to state a claim against a disloyal CEO.[131] While Plaintiff has not pled a *MacMillan* fraud-on-the-board claim, it has pled facts that support a reasonable inference that the Board was not fully informed of Tartavull's conduct—as contemplated in *MacMillan*.[132] The Board, like shareholders, cannot approve (and

---

[130] TOB at 36.

[131] *See Kahn v. Stern*, 2018 WL 1341719, at *1 n.4 (Del. Mar. 15, 2018) (ORDER) (highlighting that a plaintiff can state a *Revlon* claim "where impartial board members did not oversee conflicted members sufficiently"); *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999) ("The presumptive validity of a business judgment is rebutted in those rare cases where the decision under attack is 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'") (citing *In re J.P. Stevens & Co., Inc.*, 542 A.2d 770, 780–81 (Del. Ch. 1988)).

[132] *See Mills Acq. Co.*, 559 A.2d at 1280 ("By placing the entire process in the hands of [the CEO and Chairman], through his own chosen financial advisors, with little or no board oversight, the board materially contributed to the unprincipled conduct of those upon whom it looked with a blind eye."). *See also In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1002 (Del. Ch. 2005) ("[T]he paradigmatic context for a good *Revlon* claim . . . is when a supine board under the sway of an overweening CEO bent on a certain direction, tilts the sales process for reasons inimical to the stockholders' desire for the best price.").

ratify) what it did not know. The Complaint alleges the Board was unaware of the February 24, 2016 lunch meeting between Baker and Tartavull.[133] On March 23, 2016, Goldman acknowledged that Tartavull and Siris had dinner without Goldman, and that it did not know (and could not report to the Board) what Tartavull discussed with Siris during that dinner.[134] Defendants have pointed to nothing in the Complaint that would overcome these well-pled allegations that the Board was uninformed. Accordingly, there is no basis to invoke Board ratification as a defense at the pleading stage, even assuming that board ratification would be a defense to a CEO's alleged breach of fiduciary duty.

## B. Plaintiff Has Not Stated a Viable Aiding and Abetting Claim

To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege facts that, if true, would demonstrate: "(1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary."[135]

---

[133] Compl. ¶ 63.

[134] *Id.* ¶ 77.

[135] *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *15 (Del. Ch. Nov. 30, 2007). *See also Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *28 (Del. Ch. Jan. 25, 1999), *aff'd*, 741 A.2d 16 (Del. 1999) (holding that a defendant will be held liable for aiding and abetting when he "purposely induced the breach of the duty of care . . . .").

"A claim of knowing participation need not be pled with particularity."[136] Yet, "it is necessary that the plaintiffs make factual allegations from which knowing participation may be inferred in order to survive a motion to dismiss."[137]

To sustain its burden to plead knowing participation in this case, Plaintiff must well-plead that Siris knew of Tartavull's conflict. In this regard, it is useful to reiterate what the alleged conflict *is* and what it *is not*. Plaintiff's proffered conflict is not simply that Tartavull sought to favor and facilitate a transaction with Siris. Instead, the conflict is that Tartavull sought to favor and facilitate a transaction with Siris *because* he thought he would lose his job and the chance at post-closing benefits if the Transaction did not close.[138] With this in mind, I am satisfied that Plaintiff has failed to plead facts from which I could reasonably infer that Siris knew of Tartavull's alleged conflict and resulting breach of fiduciary duty.

Inferences "cannot take the place of" facts.[139] Even if the Court were to assume for purposes of this Motion that spoliation occurred, as alleged, and that an

---

[136] *In re Shoe-Town, Inc. S'holders Litig.*, 1990 WL 13475, at *8 (Del. Ch. Feb. 12, 1990).

[137] *Morgan v. Cash*, 2010 WL 2803746, at *4 (Del. Ch. July 16, 2010).

[138] Compl. ¶ 84.

[139] *Collins v. Throckmorton*, 425 A.2d 146, 150 (Del. 1980); *see also In re Asbestos Litig.*, 155 A.3d 1284, 1284 n.2 (Del. 2017) (TABLE) ("Where there is no precedent fact, there can be no inference; an inference cannot flow from the nonexistence of a fact, or from a complete absence of evidence as to the particular fact. Nor can an inference be based on surmise, speculation, conjecture, or guess, or on imagination or supposition."); *Smith v.*

adverse inference is, therefore, justified, the only fact that has been pled is that Siris was communicating with Tartavull by text message during the timeframe in which they were negotiating the Transaction. This would perhaps support an adverse inference that the parties were discussing the Transaction in these text messages. One could go so far as to draw an adverse inference that Tartavull engaged in text communications with Siris without Board knowledge or authority, given the pled facts that Tartavull engaged in such unauthorized communications with Siris in other contexts. But Plaintiff conspicuously stops short of alleging any precedent facts, even on information and belief, from which a pleading stage adverse inference could be drawn that Tartavull told or otherwise indicated to Siris that he was in danger of losing his job if the Transaction fell through or that he was motivated to steer Xura into the Transaction for self-interested reasons. Nor does Plaintiff allege that Goldman tipped Siris off regarding the conflict. And the Strategic Committee could not somehow have leaked news of Tartavull's pending fate because that committee never even met with Siris.[140] In short, there are no pled facts from which an adverse

*Haldeman*, 2012 WL 3611895, at *1 (Del. Super. Aug. 21, 2012) ("Inferences draw their life from facts, and without such a factual foundation, they remain speculation.").

[140] Compl. ¶ 48.

inference that Siris knew of Tartavull's conflict, and therefore knowingly participated in Tartavull's breach, could be drawn.[141]

Plaintiff contends the fact that Siris spoke directly with Tartavull after Goldman asked to be "'ke[pt] . . . on any communications with the Company going forward'" is evidence of Siris's knowing participation in Tartavull's breach.[142] Not so. The Board authorized management to negotiate with Siris on November 5, 2015,[143] and reaffirmed that authorization during Board meetings on December 3,

---

[141] *See In re Zale Corp. S'holders Litig.*, 2015 WL 5853693, at *21 (Del. Ch. Oct. 1, 2015) (dismissing aiding and abetting claim when plaintiff failed to plead that acquirer knew about the alleged non-disclosure constituting the purported fiduciary breach); *Hospitalists of Delaware, LLC v. Lutz*, 2012 WL 3679219, at *7 ("[T]he acquirer's mere receipt of preferential terms does not demonstrate participation in the target board's breach of duty . . . ."); *Houseman v. Sagerman*, 2014 WL 1600724, at *9 (Del. Ch. Apr. 16, 2014) ("'[I]t is not the fiduciary that must act with scienter, but rather the aider and abettor.'" (citation omitted)); *Rouse Props.*, 2018 WL 1226015, at *25 (holding that buyers are "entitled to negotiate the terms of the Merger with only [their] interests in mind; [they are] under no duty or obligation to negotiate terms that benefit[] [sellers] or otherwise to facilitate a superior transaction for [sellers]."); *Morgan*, 2010 WL 2803746, at *5 ("[R]etaining management is a routine occurrence" and "[t]o view the retention of management on reasonable terms with suspicion would only undermine business practices that often facilitate the difficult transitions required when two businesses merge."); *In re Telecommc'ns, Inc. S'holders Litig.*, 2003 WL 21543427, at *3 (Del. Ch. July 7, 2003) (dismissing aiding and abetting claim and finding that "the fact that AT&T [the acquirer] negotiated with Malone [the target's CEO] and the TCI management team" does not "provide a sufficient basis for inferring that AT&T knowingly participated in any breach of fiduciary duty that may have occurred.").

[142] Compl. ¶ 44.

[143] TOB Ex. 22 at XURA0000226; *see also* Compl. ¶ 44.

41

2015[144] and February 29, 2016.[145] Xura's standard non-disclosure agreement required Siris to communicate through Tartavull and to get his permission before communicating directly with others.[146] Goldman's request to be kept in the loop was not a condition imposed by the Board or the Strategic Committee, and it certainly was not binding upon Siris. Siris's alleged disregard of that request, therefore, cannot form the basis of an aiding and abetting claim.

Plaintiff's allegations that Siris somehow aided and abetted in the Board's deficient disclosures also fall short.[147] At the outset, I note that an aiding and abetting claim based on a third-party's alleged failure somehow to *prevent* a board from providing misleading disclosures to stockholders rests on thin ice.[148] Yet that is what Plaintiff alleges here. It has pled no facts to support an inference that Siris knowingly *facilitated* alleged disclosure deficiencies or otherwise "knowingly

---

[144] Compl. ¶ 47.

[145] JX 258 at XURA0000289.

[146] TOB Ex. 16 at SIRIS0198355-56; *see also* TOB Ex. 8 at GS-XURA000180433-34.

[147] I note Plaintiff alleges Siris Defendants aided and abetted the purported disclosure deficiencies for the first time in its Answering Brief. PAB 75–76. The Complaint simply claims Siris Defendants aided and abetted a breach of fiduciary duty "by engaging in direct and improper communications with Tartavull throughout the negotiations that led to the Merger." Compl. ¶ 127. This alone is enough to disregard the claim. *In re Rouse Props., Inc.*, 2018 WL 1226015, at *23 n.197 (Del. Ch. Mar. 9, 2018) (citation omitted) ("'Under Rule 15(aaa), a party cannot use its brief as a mechanism to informally amend its complaint.'").

[148] Plaintiff unsurprisingly cites no case law in support of this argument. PAB 75–76.

participated" in that aspect of the alleged breach of fiduciary.[149]  Instead, at best, Plaintiff alleges (albeit summarily) that Siris knew certain facts and knew that the Board was not disclosing those facts to stockholders.

In any event, with regard to the specific disclosure violations Siris allegedly aided and abetted Xura in committing, Plaintiff has not alleged anything to support its conclusory allegation that "[t]he Siris Defendants knew that Francisco Partners had expressed interest and [were] diverted to the buy-side of the transaction."[150]  Nor has Plaintiff well-pled that Siris aided and abetted a breach of fiduciary duty because it "knew about [its] side deal with Neuberger[,]" but sat by as the Board failed to disclose the deal to stockholders.[151]

The knowledge standard embedded in our aiding and abetting law is "a stringent one, one that turns on proof of scienter of the alleged abettor."[152]  Plaintiff's allegations fall short of this standard.

---

[149] Courts have found aiding and abetting liability in the *narrow* circumstance where the third-party plays an active role in the "informational vacuum." *In re Rural Metro Corp.*, 88 A.3d 54, 96 (Del. Ch. 2014), *decision clarified on denial of reargument sub nom. In re Rural Metro Corp. S'holders Litig.*, 2014 WL 1094173 (Del. Ch. 2014).  Here, there is no allegation that Siris provided knowingly false information to Xura with the knowledge that the Board would disclose that information to shareholders.

[150] PAB 76.

[151] *Id.*

[152] *Binks v. DSL.net, Inc.*, 2010 WL 1713629, at *10 (Del. Ch. Apr. 29, 2010).  *See also Houseman v. Sagerman*, 2014 WL 1600724, at *9 (Del. Ch. Apr. 16, 2014) ("'[I]t is not

## III. CONCLUSION

For the foregoing reasons, the motion to dismiss Count I must be DENIED and the motion to dismiss Count II must be GRANTED.

**IT IS SO ORDERED.**

---

the fiduciary that must act with scienter, but rather the aider and abettor.'" (citation omitted)).